UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:12-CR-110 JD |
| | ) | |
| JOSEPH OLIVO (03) | ) | |

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Joseph Olivo's motion to suppress evidence recovered during a Friday afternoon search of his residence and a statement he made to law enforcement agents shortly before his initial appearance before a magistrate judge the following Monday. He argues that the search violated the Fourth Amendment because the search warrant was not supported by probable cause and contained deliberate or reckless misinformation. Regarding his statement, he argues that it must be suppressed because it was both involuntary and given prior to his initial appearance before the magistrate judge, which was unnecessarily and unreasonably delayed in violation of Federal Rule of Criminal Procedure 5. Briefing is complete, and for the reasons below, the Court denies the motion to suppress, without conducting a *Franks* hearing.

**I. BACKGROUND**

On Thursday, September 20, Deputy Robert Smith of the Elkhart County Sheriff's Department conducted a traffic stop for a signaling violation.[1] The driver attempted to flee on foot but was caught. Further investigation revealed a plastic bag with marijuana in plain view under the front seat. The driver had also been under investigation by the Interdiction and Covert Enforcement Unit (ICE Unit) for illegal drug activity, and at some point an ICE Unit Officer arrived on the scene and briefed Deputy Smith. The driver of the vehicle then indicated to the ICE Unit Officer that he

---

[1]The facts are based on the search warrant affidavit, which has been filed with the Court under seal [DE 182].

had valuable information to share. After that, Captain Shawn Turner of the Goshen Police Department, an ICE Unit Commander who also knew the driver's identity, arrived and took a statement from the driver.

The driver explained his involvement in buying and selling large amounts of marijuana from out of state, from an individual from Texas. He indicated that a large shipment (well more than 100 pounds) of marijuana had recently been received and was being stored at a residence in Rolling Prairie, Indiana, along with a large amount of U.S. currency stored in a safe. The driver identified the individual who lives at the residence as "O," whose name he knew was Joseph Olivo, and provided additional details about Olivo (whom Capt. Tuner was familiar with from prior encounters and drug intelligence) and the residence. He identified Olivo from a photograph, claimed that Olivo used to sell drugs in the Elkhart area, and detailed some of Olivo's criminal history, which Capt. Turner was able to corroborate.

The driver also indicated that he had been at Olivo's residence "prior to being pulled over,"[2] that the recent shipment of hundreds of pounds of marijuana was being distributed from that residence, and that another individual had recently purchased $90,000 worth of marijuana. He explained what he knew of the operation and stated that he knew Olivo kept his money in a large safe in his bedroom and the marijuana in a large closet in an office room. The driver also admitted to owing Olivo $26,000 in drug debt. He gave detailed directions to Olivo's residence, described the house, and indicated that there might be a white SUV in the driveway and two other vehicles parked nearby. Finally, the driver claimed that he had assisted police in the past with drug investigations.

Capt. Turner followed the driver's directions and found the residence as described, with a white SUV in the driveway. He confirmed Olivo's criminal record, and discovered that the house was

---

[2]In its initial response brief, the government states that the driver said he "had just left the defendant's residence," but this appears to be its own interpretation of the affidavit.

owned by an individual from Knoxville, Tennessee. Capt. Turner also confirmed that the driver had cooperated with law enforcement in the past and had given reliable and accurate information, which had led to the arrest of one individual for possession of a large amount of methamphetamine.

The ICE Unit was also able to corroborate more of the driver's information with a separate cooperating source who had previously given information leading to an arrest in a murder case, as well as drug information. That source stated that he knew the driver got his marijuana from "O," and that "O" had recently obtained a 350 pound shipment of marijuana from Chicago, overseen by an individual from Texas. The second source also supplied several phone numbers for both "O" and the individual from Texas.

With an affidavit based on the information from the driver and the corroboration, Capt. Turner obtained a search warrant for Olivo's residence from LaPorte Circuit Court.[3] The warrant was executed on Friday, September 21, 2012, at about 4:15 in the afternoon, eastern time. Officers found 102 pounds of marijuana, three firearms, and $144,628 at Olivo's residence.

Olivo was arrested and advised of his rights as required by *Miranda*. At that time, he indicated that he wanted an attorney. All questioning ceased. Officers completed their last inventory of the residence at 7:07 p.m., placed Olivo in federal custody, and then transported him to the St. Joseph County Jail. While in transit, Olivo attempted to initiate a conversation with agents, claiming that he no longer wanted an attorney and wanted to cooperate. According to undisputed testimony, no law enforcement agents questioned Olivo on September 21, or at any point prior to the statement he gave early Monday afternoon.

Because the arrest occurred without a warrant, the government needed to arrange for a probable cause determination within 48-hours under *Riverside v. McLaughlin*—before Monday

---

[3]The facts regarding the execution of the warrant and subsequent law enforcement activities and interactions with Olivo are taken from testimony presented at the July 18 evidentiary hearing.

morning, since the arrest occurred late in the day on Friday. Magistrate Judge Christopher Nuechterlein was unavailable for family reasons, but District Judge Robert Miller made himself available *in camera* and signed a complaint and arrest warrant. Olivo was not brought to the federal courthouse on Saturday. Court was not in session, and no court staff members or probation officers were at the courthouse. The government did not ask Judge Miller to conduct an initial appearance, instead assuming (based on prior experience) that the earliest possible time for an initial appearance was Monday at 2:00 p.m. before Magistrate Judge Nuechterlein.

Law enforcement officers transported Olivo to the federal courthouse in South Bend at about 11:00 a.m. on Monday, September 24, so that a probation officer could meet with him before his 2:00 p.m. appearance before Magistrate Judge Nuechterlein. On the way to the courthouse, Olivo asked to speak to the agents several times, but agents declined. After meeting with the probation officer, Olivo again told agents that he wanted to speak with them. This time, agents sought and obtained approval to interview Olivo from the Assistant United States Attorney prosecuting the case.

That interview began at 12:57 p.m. and was recorded. Agents made sure that Olivo knew he did not have to talk to them and that he could wait until after his appearance before the magistrate judge, at which time an attorney would be appointed. Agents also read Olivo his rights and asked him to sign an explicit waiver acknowledging that he had been read his rights and still chose to speak to agents without an attorney present. The agents began questioning Olivo about his operation and others involved, but when Olivo expressed some hesitation for his safety, the agents reminded him that he could wait until after his initial appearance to continue the conversation, once he had a lawyer. Olivo indicated that he did not want to talk to a lawyer, because he trusted the agents as much as any lawyer. When he asked how his cooperation would help him, agents told him his cooperation would be relayed to the prosecutor, who would take his assistance into consideration. The interview lasted

4

approximately 43 minutes. Olivo appeared before Magistrate Judge Nuechterlein at 2:00 p.m., as scheduled, and was appointed counsel.

On October 11, Olivo was indicted with others on charges of conspiring to distribute and possess with intent to distribute 100 kilograms or more of marijuana, possessing with intent to distribute less than 50 kilograms of marijuana, and possessing a firearm as a convicted felon and in furtherance of a drug trafficking crime. *See* DE 11. A grand jury returned a superceding indictment as to Olivo on March 13, 2013, increasing the amount of marijuana he allegedly possessed with intent to distribute to 100 kilograms or more, adding additional counts for distributing less than 100 grams of heroin and for maintaining a place for the purpose of distributing marijuana.

Olivo filed his motion to suppress on May 17, 2013 [DE 153], and a brief in support on June 7 [DE 162]. The government responded on June 24 [DE 180], and the defendant replied on July 9 [DE 187]. The government then filed a supplemental response on July 17 [DE 191], addressing issues raised for the first time in the defendant's reply brief. On July 18, the Court held an evidentiary hearing solely on the suppression of Mr. Olivo's statement to law enforcement agents [DE 192]. At that hearing, Mr. Olivo also indicated that he wished additional time to discuss with his attorney whether to testify at the suppression hearing and to consider whether he could ask for a *Franks* hearing based on purported false statements in the affidavit underlying the search warrant. The Court set a second day for evidence and argument. On July 25, the defendant filed a motion requesting a *Franks* hearing, based on his own affidavit [DE 195]. At the second day of the evidentiary hearing, on July 26, the defendant declined to introduce any evidence or testify, and the Court heard argument and set a schedule for further written briefing [DE 196]. The government filed a response to the request for a *Franks* hearing on August 1 [DE 199]. The defendant filed a response to the government's supplemental brief regarding Mr. Olivo's statement on August 2 [DE 200].

5

## II. ANALYSIS

**A.      The Search Warrant Was Valid**

Mr. Olivo challenges the validity of the search warrant, arguing that the affidavit upon which it was based did not establish probable cause. He also argues that even if the affidavit establishes probable cause, it contains material falsehoods and omissions, requiring a *Franks* hearing.

*1.      The Affidavit Was Sufficient to Establish Probable Cause*

When, as here, an affidavit is the only evidence presented in support of a search warrant, the validity of the warrant turns on the strength of the affidavit. *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003). "Probable cause is established when, based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *Id.* at 756. When probable cause depends on information from an informant, the Court must consider several factors under the "totality of the circumstances":

> first, the degree to which the informant acquired knowledge of the events through first hand observation; second, the detail and specificity of the information provided by the informant; third, the interval between the date of the events and a police officer's application for the search warrant; and fourth, the extent to which law enforcement corroborated the informant's statement.

*United States v. Searcy*, 664 F.3d 119, 1122 (7th Cir. 2011). An informant's reliability can be bolstered if the informant is known, faces the potential of criminal prosecution for providing information, or has a history of providing reliable information. *Id.* at 1123.

In this case, the Court concludes that, based on the totality of circumstances, Captain Turner's affidavit provided sufficiently reliable information to support the issuance of the search warrant. First, the informant's information came from first hand observation of and dealings with Olivo. Second, he provided significant details of Olivo's past, gave detailed directions to and description of Olivo's residence, including the color and type of vehicle that might be present, and described with great

detail the amount of marijuana and money in the residence and precisely where they were stored. And since the informant admitted that he had in the past (and planned to in the future) purchase marijuana from Olivo, there was a plausible basis for the informant's detailed knowledge. Moreover, the fact that the informant made statements against his penal interest enhances his credibility. *See United States v. Cruz-Rea*, 626 F.3d 929, 939 (7th Cir. 2010).

Third, the informant told Captain Turner that he had been at Olivo's residence "prior to" the traffic stop and that a shipment had recently arrived. While additional details about when the informant had been at Olivo's residence would have been helpful, it is clear from context that the informant had been to the residence in the very recent past—likely the same day, or perhaps a day or two before. Given the quantity of drugs reported and the ongoing nature of the criminal activity, this period is close enough in time to support probable cause. *See United States v. Pless*, 982 F.2d 1118, 1126–26 (7th Cir. 1992) (upholding search warrant based on two-day-old information that suspect "was making [methamphetamine] in the basement," noting that "[p]assage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity").

Fourth, the law enforcement agents corroborated substantial portions of the informant's story, including the location of Olivo's residence, the vehicle parked in the driveway, and, from a second confidential informant, the recent delivery of a large shipment of marijuana that was being distributed from Olivo's residence. Finally, the initial informant's history of reliable and accurate information, his known identity, and his risk of criminal prosecution add weight to the reliability of his information in this case.

The cases upon which the defendant relies are easily distinguished. In *United States v. Bell*, 585 F.3d 1045 (7th Cir. 2009), the affidavit in support of the search warrant described an informant of truly unknown reliability: he used an assumed name and the affidavit gave indication that he had

given reliable information in the past and no information about the nature of the informant's relationship with the suspect. *Id.* at 1050. The affidavit also lacked detail, giving no indication of the amount of drugs or how the informant knew the "baggies" he had seen contained crack cocaine. *Id.*

In *Peck*, 317 F.3d 754, the affidavit was based on the testimony of an unknown witness claiming to be the suspect's girlfriend. She had never provided information in the past *Id.* at 756. While she claimed that she knew based on personal experience that the suspect possessed large amounts of crack cocaine and marijuana, she provided no additional details regarding the amount of drugs, where they were stored, or how often they were sold. *Id.* The affidavit also did not indicate how the informant knew the substances were illicit drugs. Finally, the police made no attempt to corroborate the substance of the informant's claims. *Id.*

Similarly, in *United States v. Koerth*, 312 F.3d 862 (7th Cir. 2002), the court noted that because the affidavit failed to explain the extent that the informant had previously provided information, the informant was to be treated as an informant of unknown reliability. *Id.* at 867–68. The government agreed that the evidence was insufficient to establish the informant as reliable, and the affidavit did not explain what steps, if any, had been taken to corroborate the information. *Id.* at 868. In *United States v. Mykytiuk*, 402 F.3d 773 (7th Cir. 2005), the affidavit contained no information about the informant's past reliability or corroboration of the claims by law enforcement. *Id.* at 776. Moreover, the informant provided only a single detail (the "thin reed" that methamphetamine materials were stored in five gallon buckets). *Id.* at 776–77.

The comparisons by defendant to *Bell*, *Peck*, *Koerth*, and *Mylytiuk* demonstrate that the situation is almost entirely reversed in this case. Here, the information came from a known informant who had provided reliable information in the past—perhaps the most significant factor discussed in any of the cases cited. In addition, the informant gave detailed information on the amount and location

of drugs and money, based on his recent contact and criminal involvement with the suspect, and law enforcement corroborated significant details of his story, suggesting that the unverifiable details were also true.

### 2. *The Defendant Is Not Entitled to a Franks Hearing*

"There is, of course, a presumption of validity with respect to the affidavit [or testimony] supporting a search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Nevertheless, "where the defendant makes a *substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id*. at 155-156 (emphasis added). "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id*. at 156.

The defendant's burden in the "preliminary showing" phase is significant. "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id*. at 171. "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id*. "They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons." *Id*. "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id*. In other words, a defendant's request for a *Franks* hearing must be

9

supported by *real evidence*. Conclusory, self-serving statements are not enough. *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009).

The only evidence that Olivo provides in support of his request for a *Franks* hearing is his own affidavit, which includes the following assertions. First, he claims to know the identify of the informant and that the informant was not at his residence on September 20, 2012, and had not "just come" from the residence when he was pulled over. Second, he "believes" that ICE Unit members had been following the informant and knew that he had not "just left" Olivo's home. Third, law enforcement did not include in the affidavit the fact that the informant had a criminal record and was on parole. Fourth, he also claims to know the identity of the second informant and "believes" that informant was in the car with the first informant when it was pulled over (he does not say how he knows this). Finally, he claims that the second informant did not personally know him and could not have given Captain Turner his cell phone number.

These facts, even if believed (despite the self-serving nature of the affidavit), does not establish any material falsehood or omission from the search warrant affidavit. First, as discussed, the affidavit does not claim that the informant had "just come" from the residence, merely that he had been at the residence "prior to" the traffic stop. Olivo's claim does not contradict the statement in the affidavit. Moreover, even if the affidavit had claimed that the informant had just come from the residence, such a close proximity in time would not have been material for the reasons discussed above. Second, he provides no real evidence for his belief that ICE Unit members had been following the informant and does not give any indication of how long they were supposedly following him. Again, this does not contradict the affidavit's statement that the informant claimed he had been at the residence prior to the traffic stop. Third, it is not clear how the informant's specific criminal record was material to the probable cause determination: it is clear from the affidavit that the informant is

a drug dealer, and the fact that he was on parole only reinforces the conclusion that his statements were made against his own penal interests. *See United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006) ("[A]n informant's criminality does not in itself establish unreliability"). Finally, there is no indication of how Olivo knows that both informants were in the car together on September 20 or that the second informant could not have known Olivo's cell phone number; perhaps more importantly, there is no explanation regarding why these facts would have any bearing on the probable cause determination.

Olivo has presented no real evidence that the affidavit contained materially false statements. No *Franks* hearing is warranted.

**B.     The Defendant's Statement Was Properly Taken**

Olivo raises two challenges to the statement he gave to law enforcement agents just prior to his initial appearance before the magistrate judge. First, he claims that his statement must be suppressed because the delay between his arrest and presentment to the magistrate judge was unnecessary and unreasonable, in violation of Federal Rule of Criminal Procedure 5. Second, he claims that he was interrogated without an attorney present, despite exercising his right to counsel.

*1.     The Government Did Not Violate Rule 5(a)*

Federal Rule of Criminal Procedure 5(a) requires that an arrestee be presented to a magistrate judge "without unnecessary delay." In *McNabb v. United States*, 318 U.S. 332 (1943) and *Mallory v. United States*, 354 U.S. 449 (1957), the Supreme Court established a rule that a defendant's confession is inadmissible if given after an unreasonable delay in bringing him before a magistrate judge. *See United States v. McDowell*, 687 F.3d 904 (7th Cir. 2012). More recently, in *Corley v. United States*, 556 U.S. 303 (2009), the Court reaffirmed this rule, subject to the qualification imposed by 18 U.S.C. § 3501(c) that a statement that is voluntarily given within six hours of arrest is not

inadmissible "solely because of delay" in presentment. "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed." *Id.* at 322.

The Court holds that under the facts described above, the delay in presentment in this case was neither unreasonable nor unnecessary. Officers executed a search warrant at 4:15 p.m on a Friday, and did not complete the search until after 7:00 p.m. Even if the officers had immediately arrested Olivo and rushed him back to the federal courthouse in South Bend, it would have been too late to hold an initial appearance before Magistrate Judge Nuechterlein. Olivo was then presented at the next available time, which was, according to the magistrate judge's calendar and practice, Monday at 2:00 p.m. Weekend delay due to the unavailability of a magistrate judge is not unreasonable. *United States v. VanPoyck*, 77 F.3d 285, 289 (9th Cir. 1996). And it is certainly not unnecessary, given the magistrate judge's schedule—something out of the control of law enforcement agents or the prosecutor.

Nor is there any indication that the purpose of the delay was to obtain a statement: Olivo began asking to speak with agents within hours of his arrest, despite his initial request for counsel. Without the benefit of legal advice, however, agents scrupulously honored his right to counsel and refused to talk to Olivo without an attorney present. Had they spoken with the prosecutor, they would likely have learned that they could speak with Olivo as long as he initiated the conversation and that his statement would have fallen under § 3501(c)'s six-hour rule. Olivo was not at all reticent to talk and made repeated requests to speak with agents; finally, shortly before the initial appearance and after getting legal advice, the agents acquiesced. Olivo made his statement in full knowledge of his legal rights and knowing that he had only to wait another hour for counsel to be appointed.

Olivo argues that he should have been presented to Judge Miller on Saturday, when he reviewed and signed the Complaint and signed the arrest warrant. This ignores the fact that Judge Miller considered the complaint and arrest warrant *in camera*, and that holding a hearing with the defendant present in court is an entirely different and more complicated affair. The Court was not staffed for business. No court staff is present on the weekend, nor are probation officers available to prepare a pretrial bond report. Presenting Olivo on a Saturday was not a viable option, and therefore the delay until Monday was not unreasonable or unnecessary.

   *2.     The Defendant Initiated the Conversation with Law Enforcement Agents*

A suspect has a right to an attorney for an in-custody interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444-445 (1966). Once this right is invoked, law enforcement agents may not question the suspect "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). "A suspect initiates conversation if he makes a statement that 'evince[s] a willingness and a desire for generalized discussion about the investigation." *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009) (holding that defendant's inquiry "What do you want?" after sitting in police department for twenty minutes was sufficient to initiate a conversation); *see also United States v. Robak*, 230 Fed. App'x 607, 609 (7th Cir. 2007) (unpublished) ("Can't we talk about it?"). If the government establishes that the defendant initiated the conversation, it must then also show that the "purported waiver was knowing and intelligent and found to be so under the totality of the circumstances." *Edwards*, 451 U.S. at 486 n.9; *Robinson*, 586 F.3d at 545 ("By itself, a suspect's initiation of conversation does not necessarily constitute a waiver of his right to counsel; the suspect's waiver must also be knowing and voluntary, under the totality of the circumstances, before law enforcement agents engage in any interrogation." (citing *Edwards*)).

In this case, the Court has no difficulty concluding that Olivo initiated a conversation with law enforcement agents, based on the undisputed testimony of the agents and corroborated by their deference to Olivo's rights during the recorded interview. From shortly after his initial invocation of his right to counsel until he gave his statement, he demonstrated an eagerness to speak with an agent without an attorney in order to "help himself." Moreover, the recorded statement demonstrates that Olivo was read his rights, knowingly and intelligently signed a waiver, and continued to speak with agents despite being informed that his initial appearance was an hour away and that he would be appointed an attorney.

Olivo argues that his waiver and statement should not be considered voluntary under the totality of the circumstances. First, he points to the 68 hour delay between his arrest and presentment and "the coercion inherent in custodial interrogation," citing to *Dickerson v. United States*, 530 U.S. 428 (2000) and its rationale for upholding *Miranda*. Second, he argues that the fact that the arresting agents transported Olivo to the federal courthouse on Monday morning, rather than the U.S. Marshal, shows that they intended to take his statement. Third, he contends that it is clear from the recorded conversation that "the Government agents did not explain the defendant's *Miranda* rights to him" and that the defendant did not understand his rights. Finally, he complains that "the Government agents also informed the defendant that leniency or consideration would be given to him if he made a statement."

The Court disagrees. First, as discussed above, a weekend delay in presenting an arrestee is not inherently unreasonable and does not make a statement automatically inadmissible. The Court's concern in *Dickerson* was to reaffirm the value of the *Miranda* warnings—which were indisputably given in this case both initially and again before the statement—not to outlaw custodial confessions altogether. Moreover, the defendant indicated that he wanted to speak to agents within a few hours

of his arrest—it was the agents, not Olivo, who held out for over two days. Second, his suggestion that it was improper for arresting agents to transport him to the courthouse is without any evidentiary basis. Third, the Court has reviewed the recorded conversation between Olivo and the agents and finds that Olivo fully understood his rights and that he would soon be presented before the magistrate and receive a lawyer, yet knowingly and intelligently waived his rights. Finally, a review of the recorded statement also reveals that agents did nothing more than promise to bring Olivo's cooperation to the attention of the prosecutor, which does not render the confession involuntary. *United States v. Walker*, 272 F.3d 407, 412 (7th Cir. 2001). Olivo's waiver was knowing and intelligent and his statement was voluntary. It will not be suppressed.

### III. CONCLUSION

The government has demonstrated that the September 21, 2012, search warrant was supported by probable cause, and Mr. Olivo has not made the showing required to conduct a *Franks* hearing to challenge the veracity of statements in the affidavit. Moreover, the weekend delay between Mr. Olivo's arrest and his presentment before the magistrate judge was not unreasonable or unnecessary. The Motion to Suppress [DE 153] and the Motion for a *Franks* Hearing [DE 195] are therefore **DENIED**.

SO ORDERED.

ENTERED:  August 13, 2013

/s/ JON E. DEGUILIO
Judge
United States District Court